GROSJEAN, Supervisor of Public Accounts,
v. CHALMETTE PETROLEUM COR-
PORATION.

No. 16561.

Court of Appeal of Louisiana. Orleans.

Feb. 7, 1938.

Gaston L. Porterie, Atty. Gen., Justin C. Daspit, Asst. Atty. Gen., Fred A. Blanche, of Baton Rouge, E. L. Richardson, Asst. Atty. Gen., and Maurice B. Gatlin, of New Orleans, for appellant.

Monroe & Lemann and Nicholas Callan, all of New Orleans, for appellee.

McCALEB, Judge.

On February 21, 1936, the supervisor of public accounts filed a rule in the civil district court against the Chalmette Petroleum Corporation, alleging that the latter was a dealer in kerosene within the meaning of Act No. 228 of 1926 as amended by Act No. 15 of 1932, and that, as such, it had in its possession at its place of business in Chalmette, La., 10,000 gallons of kerosene upon which the tax imposed by law had never been paid. Upon this complaint, the court issued a rule against the defendant corporation to show cause why it should not be prohibited from further pursuit of its business as a dealer in kerosene until such time as it has paid the tax due the state of Louisiana, plus inspection fees, penalties, and attorney fees.

In answer to the rule nisi, the defendant admitted that it was a dealer subject to the provisions of the state law and that on or about January 22, 1935, it had in its possession a tank car (SERX 573) containing petroleum products. It denied, however, that there was any tax due by it, for the reason that this product was known as gas oil and was nontaxable because it had a gravity test of only 32.2 degrees.

After hearing the evidence on this issue, the district judge dismissed the supervisor's rule, and she has prosecuted this appeal from the adverse judgment.

The question presented for our determination is one of fact. It is the contention of the supervisor of public accounts that tests made of the contents of the tank car of the defendant revealed that the petroleum product showed a specific gravity of 34.2 degrees. Contra, the defendant maintains that tests made by its chemist disclosed that the specific gravity of the petroleum was only 32.2 degrees.

On trial of the case, the supervisor produced three witnesses. The first was Sidney S. Bowman, who is employed by the state as a sampler for all tank cars shipped into the city of New Orleans. He states that on January 25, 1935, he took a sample of the contents of tank car SERX 573; that in taking samples he uses an empty whisky bottle known as a "thief" which is first washed out by him and then dipped into the tank; that this so-called "thief" has a weight attached to the bottom and a string tied around the top and that, after the same has been let down and filled, the sample is taken out and poured into a can provided for by the department at Baton Rouge. These sample cans are all identified by numbers and, as soon as they are filled, they are returned to Baton Rouge, where tests of the product are made by chemists in the employ of the state. The witness further says that the usual procedure was adopted by him in the case at bar and that a sample of the defendant's tank car was placed in the can

provided for by the state, marked by him, and forwarded to Baton Rouge.

Fred J. Mechlin, a graduate chemist, who is the director of laboratories for the supervisor of public accounts, testified that the sample taken by Bowman was received by him and that he made an analysis thereof. He says that the test revealed that the product had a specific gravity of 34.2 degrees.

R. Lewis Minville, Jr., also in the employ of the state, corroborates Mr. Mechlin's testimony.

On the other hand, the defendant produced its chemist, L. P. McCurnin, who stated that he had analyzed the contents of defendant's tank car and that his findings showed a specific gravity of 32.2 degrees.

Counsel for the defendant suggest that the evidence of the witnesses for the state exhibit certain irreconcilable conflicts and that for this reason the testimony of defendant's chemist should prevail. They argue that, in view of the procedure adopted by Mr. Bowman in taking the sample, a fairly accurate test of defendant's product could not be obtained, because Bowman stated that he dropped the "thief" into the bottom of the tank, whereas the correct way to get a sample, representing the true gravity of the petroleum, is to secure a portion of the contents from the top, the middle, and the bottom of the tank. They also say that the testimony of the state's chemist, Mr. Mechlin, affirms such a conclusion.

We find, however, from an examination of the statement of Mr. Bowman, that he took the sample from the tank car in the ordinary and usual manner. Mr. Mechlin says that the method used by Bowman "is the customary way of doing it."

Counsel for defendant also intimate that, due to the number of samples taken by Mr. Bowman, there is always a possibility that they might be mixed between the time they are shipped and the time they reach the chemist of the state department. But we feel that this is improbable, in view of the fact that each sample is numbered and the cans containing them are sealed.

Counsel also say that it is evident that some mistake has been made in this case because Bowman testified that he poured only one quart of the fluid into a two-quart container of the state department,

whereas Mechlin testified that, when he made his examination of the product, the container was approximately full. We do not regard this discrepancy as important, inasmuch as it would be almost impossible for Mr. Mechlin or Mr. Bowman, due to the number of samples taken and analyzed, to recall the exact amount of petroleum contained in each and every one of the cans.

It is difficult, however, for us to account for the wide divergence in the findings of the chemists of the state and that of Mr. McCurnin of the defendant corporation. Counsel for the state suggest that the result obtained by Mr. McCurnin is palpably incorrect, for the reason that the instruments used by him in his analysis are concededly not of the quality required by the United States Bureau of Standards. This admission on the part of Mr. McCurnin is of utmost significance, but it cannot in itself solve the problem now before us, for the reason that we do not find in the testimony of the chemists for the state department any showing by them with respect to the method they adopted in arriving at their conclusion that the product contained a gravity of 34.2 degrees.

This rule was taken under the provisions of Act No. 228 of 1926 as amended by Act No. 15 of 1932. The applicable section of the amendatory act reads as follows:

"Section 7. That in order to provide a revenue for the purposes set forth in this Act and in order to carry out the same, there is hereby levied a tax of one cent per gallon on all kerosene sold, used, or consumed in the State of Louisiana for domestic consumption.

"The term Kerosene as mentioned in this Act is what is ordinarily known as Kerosene, or such oils of like quality used for same purposes."

It will be noticed from the foregoing that a detailed definition of kerosene with respect to gravity, flash, etc., is not given. However, by Act No. 15 of the First Extraordinary Session of 1934, which is, in effect, a supplement to the act of 1932, the Legislature has set forth a specific definition of taxable kerosene. The meaning of kerosene as explained in this later act is applicable to the case at bar for the reason that the tax upon the product herein sought became due, during the year 1935, after the statute was in force. The

pertinent provision of the act is section 1, reading as follows:

"That in order to provide a revenue for the purpose set forth in this Act and in order to carry out the same, there is hereby levied a tax of one cent per gallon on all kerosene sold, used, consumed, distributed or handled in the State of Louisiana for domestic consumption.

"The term 'kerosene' as mentioned in this Act is intended to include and shall include what is commonly known as coal oil, furnace oil, lamp oil, tractor fuel, distillate, burning oil, stove oil, or by any other similar name, and is defined as follows:

"A refined petroleum product having the following properties to-wit: gravity 34° to 48°; Taglibue closed cup flash point 110° F. (43.3° C.) minimum; recovery at 575° F. (310.6° C.) 90% minimum; *testing and analyzing to be done in accordance with the methods adopted by the United States Department of Commerce;* relative viscosity at 68° F. (20° C.) Cottrell-Ostwald viscosimeters between .8000 to 5.000; burning test: capable of being burned in a lamp, furnace, stove, tractor or motor." (Italics ours.)

In view of these provisions, it is imperative, in order to determine whether the product is kerosene or not, that the test be made in accordance with the methods adopted by the United States Department of Commerce. There is nothing contained in the record before us to show that the analyses of either the state or the defendant were made in conformity with the standards prescribed by the statute. It is highly essential that the methods adopted by the chemists in making the tests be shown and, due to the absence of this proof, we believe that, in the interest of justice, this case should be remanded for the purpose of taking additional evidence on this score. We find this to be especially true when we consider the difference of opinion between the experts produced in the case, for it is not conceivable that, if these chemists examined the same product, the results obtained by them would reveal such a variance, provided the accredited method prescribed by the statute was adopted.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be and it is annulled, avoided, and set aside, and it is now ordered that this case be remanded to the district court for fur-

ther proceedings according to law and not inconsistent with the views herein expressed; taking of all costs to await final determination of the cause.

Reversed and remanded.